

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

DMP:SK/MEL/AFM                                         *271 Cadman Plaza East*
F.# 2015R01313                                         *Brooklyn, New York 11201*

October 22, 2021

By ECF

The Honorable William F. Kuntz II
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

        Re:    United States v. Ali Saleh
               Criminal Docket No. 15-517 (WFK)

Dear Judge Kuntz:

        The government respectfully submits this letter in advance of sentencing in the above-captioned case, which is scheduled for November 17, 2021.  More than three years ago, on July 24, 2018, the defendant Ali Saleh pleaded guilty to two counts of attempting to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B(a)(1).  The defendant repeatedly attempted to travel to the Middle East to fight in support of the Islamic State of Iraq and al-Sham ("ISIS"), sent money to another individual to help him to do the same, distributed instructions online on how to make an explosive device, and transported explosive materials in a car heading to New York City.  Under the United States Sentencing Guidelines, the defendant's advisory Guidelines range is 360 months' to 420 months' imprisonment, and his conduct warrants a Guidelines sentence.

        The defendant is also scheduled to be sentenced for assaulting a federal correctional officer and possessing contraband in prison, actions he committed during his pretrial detention in this case, and to which he pleaded guilty to the indictment on the morning his trial was scheduled to begin.  See EDNY Case No. 18-CR-468.  The government will file a separate sentencing memorandum addressing the appropriate sentence for those crimes.

        Importantly, the defendant's plea in the above-captioned terrorism matter is governed by a plea agreement (which contains a Guidelines stipulation and appeal waiver), whereas the defendant's plea in the parallel assault matter is not.  For this reason, the

government respectfully requests that the Court conduct the sentencings in separate and successive proceedings on the same day.

**Offense Conduct and Procedural History**

The defendant made at least six separate attempts to travel to the Middle East and wage violent jihad on behalf of ISIS.[1]  The defendant also provided assistance to other aspiring ISIS fighters, posted instructions online on how to make an explosive device, and transported explosive materials in a car heading to New York City.

I.      The Defendant's Offense Conduct

      A.      Background on ISIS

ISIS is widely recognized as one of the preeminent terrorist threats in the world today, responsible for more deaths than any other terrorist or extremist group over the past several years.  At the time of the defendant's offense conduct, ISIS was pursuing the objective of establishing an Islamic state, or caliphate, based in the Middle East and controlled territory in Syria, Iraq, and Libya; it also maintained a presence in other countries, including Egypt, Yemen, and the Philippines.  ISIS routinely carried out killings and deliberate targeting of civilians; mass executions; persecution of individuals and communities on the basis of their religion, nationality, or ethnicity; kidnapping of civilians; forced displacement of Shia Muslim communities and minorities; killing and maiming of children; rape; and other forms of sexual violence.  ISIS recruited thousands of foreign fighters from across the globe to assist with its efforts to expand its caliphate in Iraq and Syria.  ISIS also leveraged technology—including the internet, social media, and encrypted communications platforms—to spread its violent extremist ideology and for the purposes of inciting adherents to commit terrorist acts.  Tens of thousands of extremists have traveled to the Middle East to join ISIS.

---

[1]      ISIS is a designated foreign terrorist organization, also known as the Islamic State of Iraq and the Levant ("ISIL").  On or about October 15, 2004, the United States Secretary of State designated Jam'at al Tawhid wa'al-Jihad (popularly known as "al-Qaeda in Iraq" ("AQI")) as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act ("INA") and as a Specially Designated Global Terrorist ("SDGT") entity under Section 1(b) of Executive Order 13224.  On May 15, 2014, the Secretary of State amended the designation to add the alias Islamic State of Iraq and the Levant as its primary name.  The Secretary also added the following aliases to the ISIS listing: the Islamic State of Iraq and al-Sham, the Islamic State of Iraq and Syria, al-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production.  On or about September 21, 2015, the Secretary of State added the following aliases to the FTO listing: Islamic State, ISIL, and ISIS.  To date, ISIS remains a designated FTO.

At the time of the defendant's offense conduct, Abu Bakr al-Baghdadi was the self-proclaimed leader of ISIS.  On June 29, 2014, ISIS released an audio recording declaring a "caliphate" consisting of territory under ISIS control in Iraq and Syria and stating that Baghdadi would be the "caliph" or "leader for Muslims everywhere."  In a separate video recording released on July 5, 2014, Baghdadi urged Muslims from across the world to "do jihad in the cause of God, incite the believers and be patient in the face of this hardship." ISIS members and associates produced and disseminated recruiting materials and propaganda encouraging others to travel to the Middle East to fight for ISIS and encouraging those who were unable to travel to instead conduct attacks in their home countries.  For example, on or about September 21, 2014, ISIS spokesperson Abu Muhammad al-Adnani called for attacks against citizens—civilian or military—of the countries participating in the U.S.-led coalition against ISIS.  On or about March 31, 2015, ISIS recruiter Junaid Hussain commanded ISIS supporters around the world to "rise up."  In a post on Twitter, Hussain stated: "Lone Wolfs Rise Up"; "If you can't make the hijrah [travel to the Middle East], dont sit at home & give up . . . ignite a bomb, stab a kaffir [disbeliever or non-Muslim], or shoot a politician!"; "if you came here, you'd be on the frontline fighting, right? But u couldn't come here, so why not fight the kuffar over there?"; and "i always see in the media brothers getting caught making hijrah, brothers know that your jihad is not over just because you got stopped."

While ISIS has now been largely defeated in its home territory of Syria and Iraq, it remains capable of launching attacks in those countries, and has also inspired individuals and affiliated groups to stage attacks in other parts of the world, including the United States.  The point does not need to be belabored: ISIS has killed countless people and seeks, without exaggeration, the destruction of the United States of America.  See, e.g., United States v. Suarez, 893 F.3d 1330, 1332 (11th Cir. 2018) (ISIS follower had "declared allegiance [to ISIS and] attempted to recruit others to join him in destroying the United States"); Doe v. Mattis, 889 F.3d 745, 749 (D.C. Cir. 2018) (ISIS "controls territory in Iraq and Syria, and has perpetrated and aided terrorism there and around the world, killing several thousand civilians, including American aid workers and journalists"); United States v. Khusanov, 731 F. App'x 19 (2d Cir. 2018) (noting that ISIS has a "history of particularly violent conduct" and "target[s] members of the United States armed forces serving abroad and encourage[s] terrorist acts within this country") (citation omitted).

B.    The Defendant's Attempts to Wage Jihad for ISIS

The defendant is a U.S. citizen who was born and raised in the Jamaica neighborhood of Queens, New York.  For a brief period of time in 2015, he moved to Fort Wayne, Indiana, but he otherwise lived in Queens for the duration of his life.  In approximately 2013, the defendant became interested in the conflict in Syria, and he specifically became interested in ISIS.  He thereafter swore an oath of allegiance to ISIS and decided to travel to the Middle East in support of ISIS.

The defendant espoused his support for ISIS through multiple public online forums.  For example:

- On June 20, 2014, the defendant tweeted: "#AllEyesOnISIS The Islamic State of Iraq and Sham is the first step to a united khilafah [caliphate] race to it oh Muslims and dont drag your feet."

- On June 29, 2014, the defendant retweeted: "You MUST give bayah [oath of allegiance] and you MUST make hijrah [travel] and jihad is FARDH AYN [a religious obligation]."

- On July 10, 2014, the defendant posted a comment on CNN stating: "We are going to see a lot of be headings of American soldiers and I want front row seats."

- On August 5, 2014, the defendant retweeted: "I'm calling on all the Muslims in the West to make hijrah with your families to the land of khilfah."

- On August 15, 2014, the defendant retweeted: "Hasten to make Hijra my brothers and sisters before the window of opportunity for those in the West close."

- On August 25, 2014, the defendant retweeted: "I'm ready to die for the Caliphate, prison is nothing."

- On August 28, 2014, the defendant retweeted: "Lets be clear the Muslims in the khilafah need help, the one who is capable to go over and help the Muslims must go and help."[2]

That same day, August 28, 2014, the defendant made a reservation to travel on Ukraine Airlines from John F. Kennedy International Airport in Queens, New York ("JFK") to Kiev, Ukraine, and then on to Istanbul, Turkey, with the intention of traveling by land from Turkey to Syria to fight for ISIS.  Turkey was a common transit point to obtain entry into Syria, and many citizens of Western countries who travelled from the United States and Europe to join ISIS followed the route of entering Turkey legally and then being smuggled by facilitators across the border into Syria.  The defendant's flight to Turkey was scheduled to depart

---

[2]      The excerpts of social media postings included herein are merely examples. The defendant had at least nine Twitter accounts, as well as accounts on Facebook, Kik, and Telegram, and over the course of more than one year, the defendant posted and reposted hundreds of messages glorifying ISIS, promoting violent jihad, spreading ISIS's propaganda, and supporting its objectives.

4

approximately ten days later, on September 12, 2014.  The defendant paid for the booking with cash (approximately $598.78).  The defendant also applied for a visa to enter Turkey. The defendant was ultimately prevented from traveling because his parents took his passport away.

After his failed attempt to travel in September 2014, the defendant ordered a fire starter knife and folding knife from Amazon, as well as a book titled "Messages to the World: The Statements of Osama Bin Laden."  On Twitter, he retweeted, "Do not ask for anyone's advice and do not seek anyone's verdict.  Kill the disbeliever whether he is civilian or military\," and tweeted, "Get close to the real kuffar and assassinate them."

The defendant also engaged in the following private conversation over Twitter messages with an ISIS supporter located in Mali ("CC-1"):

| | |
|---|---|
| CC-1: | Tell me why u don't make hidjra!? |
| SALEH: | I want 2\nBut I don't have a passport\nInshallah if I get my passport I will go 2 Sham [Syria] but if I can't \nI will go to Yemen \nMy home town |
| SALEH: | Akhi [my brother] if it's too dangerous to risk it save it for another time \nDon't jump into the river when it's roaring \nU have a family to worry about |

. . .

| | |
|---|---|
| SALEH: | Ameen \nWallahi [by God] I want to go to Syria but I think it might be easier 4 me to go to Yemen wallahua3lam |
| CC-1: | Why? |
| SALEH: | They are very strict in Darul kufr [the land of the infidels, i.e., the United States] |
| SALEH: | And my family was born in Yemen |
| SALEH: | If there's a chance to go from Yemen inshallah it will take it |
| CC-1: | Can u go to yeman easly? |
| SALEH: | Yes I have been 2 Yemen before my family is from there |
| CC-1: | Oki AlhamdoulilAh, may Allah subhanawata'la Make it easy for u |

The defendant continued posting a number of messages using various Twitter accounts from the end of 2014 through 2015, endorsing ISIS's brand of violent jihad and noting the rise of ISIS in Yemen.  For example:

- On September 27, 2014, the defendant retweeted: "The Yemani people are asking Islamic State Mujahideen to come and fight against the houthis and tge Government."

- On October 23, 2014, the defendant tweeted: "Jihad is a tenant of Islam and it will continue until the whole world is under the rule of AllahHadith U can't change that."

- On January 22, 2015, the defendant tweeted: "ISIS gaining in Yemen, competing with AQAP http://t.co/COHLlKNsr2\n \nClashes between #IS/#AQAP and Hūthīs now!"  The acronym "AQAP" is a reference to al-Qaeda in the Arabian Peninsula.

- On February 12, 2015, the defendant retweeted, "When some talk about Hijrah to the Islamic State they somehow forget about the Wilayat [provinces]. Don't forget, Libya, Sinai, Khorasan," and tweeted his own follow-up, "Yemen too very important."

- On February 16, 2015, the defendant retweeted: "Upon you is Al-shaam; and whoever cannot, let him go to Yemen . . . ."  The term "Al-shaam" is a reference to Syria.

- On March 20, 2015, the defendant tweeted: "Double Martyrdom OP. carried out against Houthis in #Yemen it is shared with the hashtag \'The Islamic State is Sparked in San'a\.'"  "San'a" is a reference to Yemen's capital city, Sana'a.

- On March 31, 2015, the defendant tweeted: "I might be traveling soon please make dua [prayer] for me."

The defendant continued posting messages demonstrating his allegiance to ISIS well into 2015.  For example:

- On June 10, 2015, the defendant tweeted: "If i die before hijra my final will and testament is to be buried in sham inshallah khilafah will have spread by then."  In this post, the defendant expresses his desire that, in the event that he dies before making the journey to join ISIS ("If i die before hijra"), his final wish would be to be buried in Syria ("my final will and testament is to be buried in sham") within the ISIS caliphate that he hopes

will have been formed by that time ("inshallah khilafah will have spread by then").

- On June 10, 2015, the defendant retweeted: "Promises of Allah of things to come: Defeat of occupying Jews"; "Conquest of Rome"; "Conquest of the White House"; "Domination of the world by Islam."

- On June 16, 2015, the defendant retweeted: "The best thing that happened to me is Islam.  The best thing that happened to the Ummah is the Islamic State."  The term "Ummah" is a reference to the global community of Muslims.

- On June 17, 2015, the defendant retweeted: "IS is winning battle of hearts and minds.  People have started to realize that war is a necessity."  The term "IS" means the Islamic State, a reference to ISIS.

- On July 17, 2015, the defendant tweeted: "the biggest evidence for the legitimacy of military (Physical) Jihad is the Quran itself . . . because if we dont kill.them then our women and children will be blown up and killed . . . by them."[3]

During the same time period, one of the photographs associated with the defendant's Twitter account was a photograph of a billboard known to be an ISIS recruitment billboard in Iraq.

In 2015, the defendant rededicated his energy to joining ISIS overseas, and simultaneously embraced ISIS's directive to either travel to the Middle East to support the establishment of an Islamic State or take action at home to do so.  The defendant made preparations to do both.

In July 2015, the defendant bought a pack of 48 pyrotechnic mortars (large, tube-fired fireworks described as "artillery shells" on the packaging and containing explosive powder), stored them in a hidden area in the trunk of his car, and drove towards New York City.  The fireworks contained approximately 1,196 grams of low explosive powder, consisting of both pyrotechnic material and black powder.  Law enforcement agents located a cellphone belonging to the defendant during the time frame when he acquired the explosive powder and discovered on the phone an electronic pamphlet titled, "Muslim Gangs: The Future of Muslims in the West (Ebook 1:  How to Survive in the West)."  The pamphlet provided detailed instructions regarding how to create a bomb using explosive powder from

---

[3]      The defendant also repeatedly posted ISIS propaganda to his Facebook account.  For example, one post depicted a dead fighter wrapped in an ISIS flag and stated: "1000 WAYS TO DIE THIS IS THE BEST ONE."  See Exhibit B (selection of defendant's Facebook posts prior to July 24, 2015).

fireworks.  Specifically, the pamphlet stated that four main items were required: "(i) a tightly closed Container (like a metal box), (ii) filled with Explosives (example: the Blackpowder from Fireworks.) (iii) a Fuse (from fireworks, or a Rubber [Latex]) string coming out of the Container. (iv) Shrapnel: - a few metal nails, sharp rocks, ballbearing etc. which are added in the container and will shoot out like bullets when the container explodes.)."  The pamphlet then provided instructions on how to create specific devices, including a hand thrown improvised explosive device (or "IED").  The example provided in the pamphlet was a soda can grenade, and the instructions specifically stated that the soda can should be filled with "[e]xplosive powder (i.e. from Fireworks)."  The pamphlet also provided instructions on how to make more complicated explosive devices, such as a pressure cooker bomb and a pipe bomb.  The defendant retweeted the pamphlet's image of a soda can hand grenade with instructions on how to build an improvised explosive device.  See Exhibit A (filed under seal).  The defendant also retweeted a message promoting bomb-making from ISIS recruiter Junaid Hussain: "RT @AbuHussain010: Want to bake cakes but dont know how? &gt; for free cake baking training &gt; surespot: abuhussain3."[4]

        The fireworks that the defendant hid in his car were sufficient to create multiple soda can grenades like the one depicted in the pamphlet and the defendant's online post.  They were also sufficient to create the pressure cooker bomb described in the pamphlet.  As the defendant drove toward New York City with the explosive materials in his trunk, his car broke down, and he was forced to have it towed.  While in the company of the tow truck driver, the defendant removed various pieces of luggage from the car, but kept the fireworks concealed.  The defendant abandoned the car for cash and continued on to New York City by other means.[5]

        The defendant then made at least five separate attempts, over ten days, to travel to the Middle East to fight for ISIS.  First, on July 24, 2015, the defendant contacted an ISIS facilitator in Libya, who had instructed followers to contact him on the encrypted platforms Kik and Telegram "for hijrah [travel] advice to IS in Libya ONLY."  The

---

[4]        Junaid Hussain, also known by the alias Abu Hussain al-Britani, was a British hacker and well-known member of ISIS.  Hussain was one of ISIS's most prominent members, responsible for substantial online recruitment efforts, including efforts to enlist ISIS supporters in the West to travel to the Middle East to fight for ISIS, and repeated attempts to inspire terrorist plots in Western countries, including within the United States.  Not only did Hussain urge Westerners to launch attacks in their respective homelands, he also offered technical guidance on how to carry out attacks—often using coded language such as "cake baking" to refer to bomb making.  Hussain used the name "abuhussain3" on social media platforms in connection with communications related to ISIS.  The defendant communicated with Hussain and other ISIS members over encrypted messaging services.  On or about August 24, 2015, Hussain was killed in an airstrike in Raqqah, Syria.

[5]        Law enforcement officers subsequently searched the car and found the fireworks hidden in the trunk of the car and a tactical knife located inside the car.

defendant then made a same-day one-way booking to travel on Qatar Airways from New York's JFK to Doha, Qatar to Cairo, Egypt.  During the summer of 2015, it had become far more difficult to cross the border from Turkey into Syria and Iraq to join ISIS, so ISIS recruiters were encouraging would-be travelers to join ISIS in Libya.[6]  Notably, Egypt and Libya are bordering countries and it was relatively easy and common at that time for individuals to travel from Egypt to Libya to join ISIS.  The defendant went to JFK and attempted to pay for the flight at the airline ticket counter, but he was informed by airline personnel that a message had come up on the screen and he left the ticket line.[7]

Second, later in the evening on July 24, 2015, the defendant went to Newark Liberty International Airport in Newark, New Jersey, approached airline personnel, and inquired about flights to Egypt.  He again left the ticket line.

Third, on July 26, 2015, the defendant reserved a flight itinerary for a same-day one-way departure on Qatar Airways from Philadelphia International Airport in Philadelphia, Pennsylvania to Doha, Qatar to Cairo, Egypt.  When the defendant attempted to obtain a boarding pass, he was denied.

Fourth, on July 27, 2015, the defendant went to Indianapolis International Airport in Indianapolis, Indiana, and appeared to again inquire into flights.  He left the airport without making any reservations.

Fifth, on August 2, 2015, the defendant went to an Amtrak train station in Cleveland, Ohio, and attempted to take a train to Toronto, Canada, where he intended to fly from Toronto to Yemen.  After law enforcement intervention, he did not board the train to Toronto and instead returned to New York City.

C.      The Defendant's Efforts to Provide Assistance to Other ISIS Supporters

The defendant also made efforts to facilitate others' support of ISIS.  Through his social media accounts, the defendant held himself out to be someone who would assist others who wanted to make "hijra" (travel) and join ISIS in the Middle East.  The defendant chose Twitter usernames that included "hijra_sponsor" and "sponsoramujahid"—which translate to "travel sponsor" and "sponsor a fighter."  When other ISIS supporters contacted the defendant on Twitter for his assistance with traveling to ISIS-controlled territory, he

---

[6]      An April 14, 2015 Twitter message indicates that the defendant around that time became aware that making hijra "would be easier through Africa."

[7]      The defendant went to JFK with luggage containing, among other things, multiple flashlights and headlamps, running shoes, a significant amount of cash including $100 bills, a solar-powered device charger, digital cameras, and a notebook.  Before the defendant left JFK, he spoke with law enforcement and gave them his cellphone number. After the defendant left JFK, he abandoned his cellphone at a newsstand.

provided them with contact information for ISIS facilitators who could help or redirected them to contact him using encrypted messaging services.

      In October 2014, the defendant engaged in a private conversation over Twitter messages with the ISIS supporter in Mali (CC-1).  CC-1 asked the defendant for advice on how to travel to Syria to join ISIS there.  In response, the defendant provided CC-1 with the contact information of a known ISIS facilitator.  CC-1 then asked the defendant for funding to travel to Syria.  In response, the defendant sent CC-1 a wire transfer in the amount of $500 to fund CC-1's travel:

| | |
|---|---|
| SALEH: | im sorry i couldnt help you akhi i heard u wanted to move from Mali |
| SALEH: | right? |
| SALEH: | do you still plan on going akhi |
| SALEH: | ? |
| CC-1: | Asalamoualeikum ya akhi [Peace be unto you, brother] |
| CC-1: | No plan yet, i need to find.money |
| SALEH: | Wa alaikum as Salam [And unto you] |
| SALEH: | May Allah make it easy 4 u |
| CC-1: | No plan yet, i need to find.money |
| CC-1: | Ameen [So be it] |
| CC-1: | Slamunaleikum ya akho [Peace be upon you, brother] ar u still using kik? |
| SALEH: | Yes |
| CC-1: | Oki, i received strange msg, like 'hdgxhdshdg' lool |
| SALEH: | Always happens When I use my phone sorry akhi |
| CC-1: | Do u have any way to gey ther? I mean road or contact? |
| SALEH: | Plane 2 turkey but it would b really hard 4 me living in the  west \nIdk about ur government policy in Mali\nMay Allah make it easy 4 all of us |

10

| | |
|---|---|
| CC-1: | Flight in Turkey n then? I don't know anyone ther |
| SALEH: | @flamessofwar[8] |
| SALEH: | She is a muhajirat [immigrant] she maybe can help u |
| SALEH: | Kik = BintFulan |
| CC-1: | Oki i will inchAllah [God willing] |
| CC-1: | thks akhi |
| CC-1: | U know anyone who can lend me money? |
| SALEH: | Not at the moment akhi sorry i will if anything comes up |
| CC-1: | InchAllah akhi [God willing brother] |
| CC-1: | Shoukrane [Thank you] |
| SALEH: | Salam akhi [Greetings brother] is that you on kik? |
| SALEH: | Abubakr990 |
| CC-1: | Wlksalam [Peace be upon you], yes akhi |
| SALEH: | Can u go on |
| SALEH: | Q= what color \nAns= Black |
| SALEH: | Salam alaikum [Peace be upon you] |
| CC-1: | Wlksalam ya Akihito [And peace be upon you brother] |
| CC-1: | Akihito [Brother] |
| CC-1: | Akhi [Brother] |
| SALEH: | That's the test question |

---

[8]    The Twitter account "@flamessofwar" belonged to Umm Ubaydah, a known female ISIS recruiter.

| | |
|---|---|
| SALEH: | U have to answer with black |
| SALEH: | \"Black\" |
| CC-1: | Ok akhi inchAllah |
| CC-1: | Ok akhi inchAllah |
| CC-1: | Ar u ther? |
| SALEH: | Yes |
| CC-1: | U didn't give me the code number |
| SALEH: | 478-450-7104 |
| SALEH: | Q: What color\nA: Black\n\nMy Name: Ali Saleh \n\nLocation: Mali |
| SALEH: | Amount 500 |
| CC-1: | AlhamdoulilAh akhi, may Allah subhanawata'la reward u with djanaatoul firdaws [Thank God brother, may God the almighty reward you with paradise] |
| CC-1: | Ameen |

Western Union records revealed that, on October 25, 2014, the defendant sent $500 to an individual in Mali.  The control number and password associated with the transaction were the same as those referenced in the defendant's Twitter conversation with CC-1 (4784507104 and "BLACK," respectively).

Before and after this conversation with CC-1, the defendant showed an interest in fundraising for ISIS.  In September 2014, the defendant answered a call for help from a well-known extremist preacher and ISIS supporter in Australia who had been arrested in the Philippines and deported to Australia.  The defendant corresponded with the ISIS supporter over Twitter and email.  On September 8, 2014, the defendant attempted to send him $100, stating, "sent it through Western Union [providing a name and tracking number] May Allah make it easy 4 u & ur wife."  However, the transfer was blocked by Western Union.

On October 1, 2014, the defendant engaged in a private conversation over Twitter messages with another coconspirator ("CC-2").  Email records reflect only CC-2's side of the conversation, which included the following statements:

| | |
|---|---|
| CC-2: | And with western union, you send money and does the |

|        |                                                                 |
|--------|-----------------------------------------------------------------|
|        | person receiving just walk in and say their name then collect the money or does it go |
| CC-2:  | Through bank accounts?                                          |
| CC-2:  | Then once he gives them the number do they give him cash in hand? |
| CC-2:  | Okay, who have you sent money to before in the past may I ask   |

CC-2's statements suggest that the defendant was providing CC-2 with advice on how to send money in support of ISIS.

The next year, on April 28, 2015 the defendant engaged in the following private conversation over Twitter messages with another coconspirator ("CC-3"), indicating his own interest in sending money in support of ISIS:

|        |                                      |
|--------|--------------------------------------|
| SALEH: | alkhi how can i help                 |
| CC-3:  | Are you wanting to send money?       |
| SALEH: | yes\nhow                             |
| CC-3:  | Do you have telegram                 |
| SALEH: | no                                   |
| CC-3:  | What do you have?                    |
| SALEH: | i used to have kik/surespot          |
| SALEH: | but atm [at the moment] i dont have any |
| CC-3:  | Get surespot for your own safety     |
| SALEH: | jazaak Allah khayr                   |
| CC-3:  | Wa iyāk and then we can talk         |

Months later, the defendant continued to show interest in fundraising for ISIS. On May 31, 2015, the defendant posted the following public message on Twitter: "#IS #ISIS #Baqiyah does anyone know anything about anonymous fund transferring please DM." The terms "IS," "ISIS," and "Baqiyah" are references to ISIS, and "DM" is a reference to the ability of one Twitter user to send a direct message to another Twitter user.

D.    The Defendant's Statements to Law Enforcement

The defendant spoke with law enforcement multiple times in the days and weeks after he was denied boarding for the flight from JFK to Egypt on July 24, 2015.  In those conversations, the defendant repeatedly lied about the true purpose of his travel in an effort to persuade law enforcement officers to lift the restrictions that were preventing him from being able to travel.  For example, the defendant falsely claimed that he did not have a Twitter account, that he was traveling to Yemen for vacation and tourism, and that he did not believe ISIS was present in Yemen.

Eventually, after being confronted with some of his Twitter postings, the defendant admitted his affiliation with ISIS and made clear that he would continue attempting to travel to the Middle East to join ISIS until he was arrested.

The defendant explained that: approximately two years earlier (in 2013), he became interested in the conflict in Syria and in ISIS; he became interested in ISIS because they were having the most success against the Assad regime and because they would eventually establish a caliphate; he previously mentally swore "bayat" (an oath of allegiance) to ISIS; he felt compelled to make "hijra" to Syria; approximately one year earlier (in 2014), he booked air travel from New York to Istanbul, Turkey via Ukraine with the intention of traveling by land from Turkey to Syria to fight for ISIS; and he ultimately did not travel at that time because his parents took away his passport.

The defendant stated that in 2015 he no longer wanted to travel to Syria because he did not think he would reach it due to all the scrutiny given by other countries to people attempting to travel to Syria.  He added that his recent attempt to fly to Cairo was for the purpose of going to Yemen to join a militia and fight against the Houthis and that this was inspired in part by a hadith (religious saying) that states if you cannot go to "Sham" (Syria) you should go to Yemen.  The defendant stated that although he had decided to go to Yemen to fight against the Houthis, he still in his mind thought the best place to support his ideology was with ISIS.

The defendant admitted to having multiple Twitter accounts, as well as accounts on encrypted messaging services including Kik and Telegram; he admitted that he had spoken with multiple people associated with ISIS whom he met over Twitter; and he admitted that he spoke with those ISIS members about travelling to the Middle East and the Islamic State.

He said he was tired of America, had decided that it was time to leave, and his parents did not know that he was attempting to leave and would have been upset with him had they known.  He also stated that he would continue attempting to leave the United States because he did not want to look back and think that he didn't try hard enough to leave.  Multiple times, the defendant requested the agents to either arrest him or permit him to travel.

14

E.      The Defendant's Subsequent Conduct

After his encounters with law enforcement, the defendant changed the username of the Twitter account he had told law enforcement agents about and continued promoting ISIS's violent goals and disseminating its propaganda under new usernames. From August 3, 2015 to August 23, 2015, the defendant used a new Twitter username to publicly post the following messages:

- On August 5, 2015, the defendant retweeted an audio message titled, "Come and join the Caliphate."

- On August 10, 2015, the defendant retweeted the following message: "A Journo brother from India was recently arrested cus he wanted to be spokesperson of IS. Cow worshipers arrested him in delhi. Pls make dua." The term "Journo" is a reference to a journalist, "IS" is a reference to ISIS, and "dua" is a reference to prayer.

- On August 10, 2015, the defendant retweeted a multimedia message entitled: "The 'Aqīdah (doctrine) of Islāmic State."

- On August 21, 2015, the defendant retweeted: "#WhyJoinIslamicState because it is the duty of us Muslims to join the Jama3ah and unite under one banner."

In mid-August 2015, Twitter suspended the defendant's account and the defendant thereafter created yet another account with yet another new Twitter username.  The defendant used his newest account to resume publicly posting messages supportive of ISIS:

- On August 24, 2015, the defendant retweeted the following message: "I am a terrorist Allah say We shall cast terror into the hearts of those who disbelieve, because they joined others in worship with Allah."

- On August 26, 2015, the defendant retweeted the following message: "generations comin will nevr know about borders they will live #khilafah travelling document will be the shahadatayn."  The term "khilafah" is a reference to ISIS's caliphate and "shahadatayn" is a reference to the Islamic declaration of faith.

- On September 5, 2015, the defendant retweeted the following message: "IS is Allah's test sent down upon us. Through IS our ranks are being purified, only a jahil will mock IS."  The term "IS" is a reference to ISIS and "jahil" is a reference to a non-believer.

- On September 1, 2015, the defendant tweeted: "They are sahwat [members of the Sunni Awakening] and they have a chance to repent before they are caught in battle." The message referenced a photograph of ISIS members standing with guns, executing a group of individuals a few feet in front of them.

- On September 1, 2015, the defendant tweeted: "If they aren't implementing shariah [Islamic law] grab ur gun and implement shariah and see how fast the world turns against u."

- On September 1, 2015, the defendant tweeted: "Akhi [brother] if implementing sharia [Islamic law] is easy do it in ur neighborhood and defend it from kuffar [the infidels] and give bayah [an oath of allegiance] to IS [ISIL]."

- On September 5, 2015, the defendant retweeted the following message: "IS is Allah's test sent down upon us. Through IS our ranks are being purified, only a jahil will mock IS." The term "IS" is a reference to ISIS and "jahil" is a reference to a non-believer.

On September 17, 2015, law enforcement agents arrested the defendant at his home. During a search of the home, agents recovered paper copies of an itinerary and Turkish visa issued in the defendant's name for his September 2014 attempt to travel, and a duffel bag containing flashlights, headlamps, and other survival gear, all located inside rooms in the home. Agents also recovered a black trunk containing 29 machetes located close to where the defendant was found sleeping in the shed. The defendant acknowledged his Miranda rights but was generally uncooperative in his post-arrest interview.

II.    The Defendant's Charges and Guilty Plea

On February 11, 2016, a grand jury in this District returned a superseding indictment charging the defendant with three counts of attempting to provide material support to ISIS, in violation of 18 U.S.C. § 2339B(a)(1). See ECF No. 37. On July 24, 2018, the defendant pleaded guilty before Your Honor to Counts Two and Three of the superseding indictment. The defendant executed a written plea agreement with the government in connection with the plea and provided a complete allocution at the plea hearing. Your Honor accepted the plea. See ECF Nos. 121, 122.

The two counts of conviction span the years 2014 and 2015. In mid-2015, Congress increased the statutory maximum sentence for § 2339B(a)(1) violations from 15 to 20 years' imprisonment. Consequently, Count Two carries a statutory maximum of 15 years' imprisonment, and Count Three carries a statutory maximum of 20 years' imprisonment, for a cumulative statutory maximum of 35 years' imprisonment.

III.    <u>The Defendant's History and Characteristics</u>

        The defendant came from a loving home, surrounded by parents and siblings, and was both educated and employed.  The PSR notes that, "[a]long with his siblings, the defendant was reared by their parents in an intact home with all the basic necessities.  The defendant describes an uneventful childhood free from any instances of abuse or neglect." PSR ¶ 47.  The defendant graduated from high school and pursued some undergraduate coursework at The City College of New York and LaGuardia Community College.  He subsequently held jobs in Fort Wayne, Indiana, at his uncle's restaurant, and in Brooklyn, New York, at his father's store, and received support from his parents.  PSR ¶¶ 45, 47-50, 69, 71-75.

        In spite of this, the defendant has a long history of violent behavior.  The PSR notes that the defendant was involved in fights with his high school classmates as early as 2007-2009, resulting in two suspensions.  PSR ¶ 70.  Since his arrest in this case, in September 2015, the defendant has been imprisoned in the Metropolitan Detention Center in Brooklyn, New York (the "MDC").  Over the last six years, he has assaulted numerous federal correctional officers and staff members.  As the PSR notes, between September 2015 and January 2019 (when the PSR was issued), the defendant was cited on 69 separate occasions for disciplinary infractions at the MDC.  PSR ¶ 51.  These infractions included numerous acts of violence and the crafting of makeshift weapons.  For example:

- On June 24, 2016, as a correctional officer began to secure the food slot on the defendant's cell, the defendant rushed toward the food slot from the back of his cell which resulted in the bar connected to the food slot smashing into the officer's knee multiple times.  When the defendant was ordered to stop movement, he refused to do so.  Several minutes later, as BOP staff were attempting to photograph the cell, the defendant kicked the BOP officer in his midsection, which resulted in redness and swelling to his torso.

- On August 11, 2016, the defendant kicked a BOP officer in the upper torso during a pat-down search.

- On September 26, 2016, as BOP officers intervened to stop the defendant from pulling on a light fixture while standing on the top bunk of his cell, the defendant attempted to kick the officers.

- On October 2, 2016, BOP staff observed the defendant and another inmate grabbing and pushing each other.

- On October 23, 2016, the defendant destroyed a light fixture, broke the light, and removed a metal desk from the wall of his cell.

- On October 30, 2016, the defendant broke the metal desk in his cell and used the metal stool seat from the desk to shatter the glass window of his cell.  He then threatened to hit and kick BOP staff, stating "I'm going to hit whoever comes in here with this" and "I'm going to kick you, I'm going to kick you."

- On December 26, 2016, BOP staff observed the defendant in possession of a broken piece of his plastic food tray in his hand, an apparent make-shift weapon.

- On January 31, 2017, the defendant was observed fighting with another inmate, striking him in the upper body, face, and head area repeatedly.

- On April 2, 2017, the defendant attempted to grab the duty belt of an officer by reaching his arm out through the food slot of his cell.

- On April 27, 2017, during a routine pat down search, the defendant became combative and kicked a BOP officer in the left thigh.  The defendant then used the back of his head to strike the BOP officer in the face.

- On May 15, 2017, the defendant was asked to submit to a visual search, refused, and then lunged towards staff.

- On June 6, 2017, the defendant attempted to grab the duty belt of an officer by reaching his arm out through the food slot of his cell.

- On July 9, 2017, while BOP staff were attempting to remove the defendant's hand restraints, the defendant reversed his weight and pulled away from the door, pulling on a BOP officer's hands and scraping them against the metal food slot.  The officer sustained minor injuries to his left wrist and hand.

- On September 16, 2017, after BOP staff escorted the defendant from the law library back to his cell, the defendant kicked a BOP officer in his lower back.

- On October 3, 2017, the defendant kicked a BOP officer in the left thigh.[9]

---

[9]      On October 23, 2017, the defendant damaged the United States Marshals Service cell in the courthouse.  Specifically, the defendant was observed on CCTV throwing his body against the stainless steel partition in cell 91A, repeatedly ramming the partition

- On November 2, 2017, the defendant kicked a BOP officer.

- On November 16, 2017, BOP staff observed the defendant banging and kicking on the door repeatedly with a large metal object from a light fixture in his cell, which he had removed.

- On January 3, 2018, the defendant kicked a BOP officer in the left thigh.

- On March 27, 2018, the defendant punched a BOP officer in the face and chest.

- On April 24, 2018, the defendant slashed another inmate on the left forearm using a two-inch piece of aluminum metal.[10]

The defendant's other disciplinary infractions include multiple incidents involving swatting and property damage.  See, e.g., PSR ¶ 51 (noting multiple instances of swatting, in which the defendant activated the duress alarm without there being an emergency; property damage, including barricading and breaking his cell window and food slot and breaking the mattress, light fixture, and desk in his cell; and setting a fire in his cell).

Notably, the defendant's violent and unruly behavior continues unabated. MDC records show that between January 2019 and June 2021, the defendant was cited on at least 24 additional occasions for disciplinary infractions, including at least 11 incidents involving the destruction of property, five incidents involving possession of a dangerous weapon, three incidents involving assaults, and one incident involving setting a fire.

---

until he broke it loose, shearing the bolts from the wall, and secreting the bolts so that they could not immediately be recovered.

[10]    The defendant subsequently slashed a BOP officer in an incident that is the subject of a separate federal case (the assault matter).  See EDNY Case No. 18-CR-468.  The government will address that incident in a separate sentencing letter and, for the reasons stated above, respectfully requests that the Court impose sentence in that case in a separate and successive proceeding on the same day.  The government notes, however, that the Court can properly consider separately-charged conduct in the instant matter, even though it is also the subject of a separate indictment.  That is so because the Supreme Court has held that it does not violate the Double Jeopardy Clause to prosecute a defendant for activity that has been previously considered by a sentencing court as relevant conduct.  See Witte v. United States, 515 U.S. 389 (1995) (finding that when criminal activity is taken into account as relevant conduct under the Sentencing Guidelines, even where such use increases a defendant's offense level and thus his sentence, the defendant has not been "punished" for purposes of Double Jeopardy); see also United States v. Grisante, 116 F.3d 984, 988 (2d Cir. 1997) (interpreting Witte and citing cases).

Prior to his arrest in this case, the defendant was not diagnosed with any mental health conditions and was not prescribed any mental health treatment.  Since his arrest, the defendant has undergone extensive psychological evaluation as a precautionary measure.  See PSR ¶¶ 61-67.  On May 5, 2016, BOP forensic psychologist Dr. Samantha E. DiMisa issued a report regarding her mental health evaluation of the defendant.  Dr. DiMisa observed that the defendant "did not exhibit [] any acute psychological symptoms," that "his thoughts were organized and coherent, with no evidence of perceptual disturbance, delusional ideation, or a formal thought disorder," and that he "was not currently experiencing any delusions, hallucinations, or other serious psychopathology."  Dr. DiMisa further noted that, "although he appeared extremely dedicated to his interpretation of his beliefs, [the defendant] adamantly denied, and did not exhibit, any acute psychological symptoms or hyper-religiosity consistent with any mental illness throughout the evaluation process."  Dr. DiMisa also noted that the defendant "predominantly presented as behaviorally noncompliant and oppositional," "his uncooperative behavior appeared volitional and purposeful," and this "oppositional and defiant behavior" was "consistent across settings."  Dr. DiMisa concluded that the defendant did not present with any mental disease or defect.  See Exhibit C (filed under seal).[11]  Approximately two years later, Dr. DiMisa conducted an updated evaluation and, on April 17, 2018, Dr. DiMisa issued an updated report.  Dr. DiMisa observed that the defendant "was fully oriented to time, place, person, and circumstance," his "thought processes were coherent and organized, and his thought content was fully relevant, with no loosening of associations."  Dr. DiMisa again concluded that the defendant did not present with any mental disease or defect.  See Exhibit D (filed under seal).  The defendant declined psychological services while in prison.

---

[11]     Meanwhile, defense counsel retained defense psychiatrist Dr. Stephen N. Xenakis for additional mental health evaluation of the defendant.  On September 30, 2017, Dr. Xenakis issued a report regarding his mental health evaluation of the defendant.  Dr. Xenakis observed that the defendant "does not manifest signs of a floridly psychotic disorder with obvious hallucinations and delusions, but his thinking is unusual, idiosyncratic, and nonsensical."  Dr. Xenakis diagnosed the defendant with a personality disorder characterized as "schizotypal" and concluded that the defendant "appears to be competent to stand trial."  After this Court denied defense counsel's motion to have the defendant transferred for additional psychological testing, in part because defense counsel had provided an insufficient basis for such a transfer, defense counsel provided the government with a revised report from Dr. Xenakis, dated December 6, 2017.  In his revised report, Dr. Xenakis claimed that the defendant's mental state had recently deteriorated and Dr. Xenakis escalated his diagnosis of the defendant from a personality disorder to "Other Specific Schizophrenia Spectrum and Psychotic Disorder" and "Major Depressive Disorder."

## Guidelines Calculation

The government submits that the Court should apply the Guidelines calculation set forth below, to which the defendant stipulated in the plea agreement and which is identical to the Guidelines calculation set forth in the PSR:

| | | |
|---|---|---|
| Base Offense Level (U.S.S.G. § 2M5.3(a)) | | 26 |
| Plus: | Provision of Material Support or Resources with the Intent, Knowledge or Reason to Believe They Were to Be Used To Commit or Assist in the Commission of a Violent Act (U.S.S.G. § 2M5.3(b)(1)(E)) | +2 |
| Plus: | Terrorism Enhancement (U.S.S.G. § 3A1.4(a)) | +12 |
| Less: | Acceptance of Responsibility (U.S.S.G. §§ 3E1.1(a)-(b)) | -3 |
| Total: | | 37 |

This level carries a range of imprisonment of 360 months to life, as application of the terrorism enhancement places the defendant in Criminal History Category VI. However, because of the statutory maximum sentence, the effective Guidelines range is 360 to 420 months' imprisonment. See ECF No. 122, ¶ 2; PSR ¶¶ 26-37, 78-79.

In the plea agreement, the defendant also consented to a life term of supervised release. See ECF No. 122, ¶ 2.

## Sentencing Law

The standards governing sentencing are well-established. In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court rendered the Guidelines advisory, and emphasized that a sentencing court must consider both the Guidelines and the 18 U.S.C. § 3553(a) factors when making a sentencing decision. Id. at 264; see also United States v. Kimbrough, 552 U.S. 85 (2007) (stating that "the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence").

However, that the Guidelines are non-binding does not render them irrelevant to the imposition of an appropriate sentence. In Gall v. United States, 552 U.S. 38, 128 S. Ct. 586 (2007), the Supreme Court instructed that the sentencing court should calculate the Guidelines range, permit the government and the defendant "an opportunity to argue for whatever sentence they deem appropriate," consider all of the § 3553(a) factors, and finally pronounce a sentence taking into account all of the relevant factors. Id. at 596-97. The Gall Court further instructed that, in the event that the sentencing court decides to impose a variance, the court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." Id. (noting that a "major departure should be supported by a more significant justification than a minor one"). When

"rendering a sentence, the district court must make and place on the record an individualized assessment based on the particular facts of the case." United States v. Carter, 564 F.3d 325, 328 (4th Cir. 2009). Ultimately, the court "must state in open court the particular reasons supporting its chosen sentence." Carter, 564 F.3d at 328 (quoting 18 U.S.C. § 3553(c)).

## Argument

In this case, a Guidelines sentence is warranted because of the seriousness of the defendant's conduct, the defendant's continued disregard for the law and proclivity towards violence, and the need for specific and general deterrence. See 18 U.S.C. § 3553(a)(1), (a)(2)(A)-(C).

I.    The Defendant's Conduct Demands a Guidelines Sentence

A Guidelines sentence is necessary to reflect the seriousness of the defendant's conduct.

The Guidelines treat terrorism offenses severely and thus provide an appropriate touchstone from which to begin the § 3553(a) analysis. As the Second Circuit has observed, "the Guidelines signal that any crime promoting terrorism is to be viewed as extremely serious." United States v. Stewart, 597 F.3d 514, 521 (2d Cir. 2010).

The present case illustrates the need for such serious treatment. The defendant was completely devoted to ISIS. He openly embraced the violent ideologies of a terrorist group that has murdered United States citizens overseas and that has promoted, and taken credit for, lethal attacks against civilians on U.S. soil and throughout the world. Fully aware of this, the defendant attempted to provide himself and others in support of ISIS to continue its operations.

The evidence demonstrates that the defendant sought to provide support to ISIS in every way that he knew how. His conduct was multifaceted. He was relentless in his attempts to travel to the Middle East to fight violent jihad in support of ISIS, he repeatedly sought to raise funds for other ISIS supporters to do the same, and he followed through on ISIS's call to acquire weapons and explosives that he could use in his home country in the event he did not travel. The defendant nearly completed his plans and was stopped only by the substantial efforts of law enforcement agents. Indeed, the defendant expressly stated that he would persist in his efforts to support ISIS unless and until arrested by law enforcement.

Even though the defendant's plans were not consummated, his conduct implicates the core rationale underlying the material support statute. See United States v. Farhane, 634 F.3d 127, 148 (2d Cir. 2011) (Section 2339B "criminalizes a range of conduct that may not be harmful in itself but that may assist, even indirectly, organizations committed to pursuing acts of devastating harm"). As the Supreme Court has stated, "[t]he material-support statute is, on its face, a preventive measure—it criminalizes not terrorist attacks themselves, but aid that makes the attacks more likely to occur." Holder v. Humanitarian

Law Project, 561 U.S. 1, 35 (2010).  And as the Second Circuit recently recognized, "[W]hen it comes to sentencing terrorism, Congress and the United States Sentencing Commission plainly intended for the punishment of crimes of terrorism to be significantly enhanced without regard to whether, due to events beyond the defendant's control, the defendant's conduct failed to achieve its intended deadly consequences."  United States v. Mumuni, 946 F.3d 97, 113 (2d Cir. 2019) (internal quotation marks omitted).

The defendant's six separate attempts, over the course of one year, to travel to ISIS's proclaimed caliphate and provide himself in support of ISIS's mission are extremely serious on their own.  Attempting to provide oneself to a terrorist organization is one of the most dangerous forms of material support.  See United States v. Amri, No. 17-CR-50, 2017 WL 3262254, at *15 (E.D. Va. July 31, 2017) ("[c]ertainly attempting to provide oneself to a designated terrorist organization is at least, if not more, dangerous to human life than merely providing money").  This is so not just because the provision of oneself to a foreign terrorist organization frees up the group's resources, but because those who "knowingly [seek] to join a terrorist group . . . risk . . . being turned against the United States."  United States v. Tounisi, 900 F.3d 982, 986-88 (7th Cir. 2018) (stating that the defendant had "align[ed] himself with a group that advocates for the destruction of the United States and . . . placed himself at risk of becoming 'a pawn' in a future attack against the country"); see also United States v. Khan, 938 F.3d 713, 718-19 (5th Cir. 2019) ("[T]here is also evidence that [defendant] encouraged Garcia to join ISIS and provided funds for him to accomplish that mission, regardless of whether Garcia would be fighting in Iraq or Syria. Garcia did in fact travel to Iraq and joined ISIS. In any event, ISIS is an enemy of the United States.").

The defendant's attempts to provide assistance and money for other ISIS supporters and aspiring fighters is equally serious.  See United States v. Taleb-Jedi, 566 F.Supp.2d 157, 167-69 (E.D.N.Y. 2008) (noting that the "the provision of personnel, like the provision of money, acts to free up others in a terrorist organization to engage in violence and other acts of terrorism").  This is particularly so because ISIS's operations benefit from even modest sums of money.  For example, the amount of money that the defendant sent to CC-1 in Mali—$500—was likely sufficient to fund a one-way trip by CC-1 to Syria (note that the defendant's own September 2014 ticket from JFK to Turkey cost only $598.78).  To provide additional perspective, the U.S. Department of Defense estimated that, on the battlefields of Syria, Iraq and Afghanistan, where U.S. and allied troops engaged ISIS forces, a suicide bombing vest cost approximately $1,200 and a remote-controlled pipe bomb cost only approximately $400.  See Dina Temple-Raston, "How Much Does a Terrorist Attack Cost? A Lot Less Than You'd Think" (June 25, 2014), available at https://www.npr.org/sections/parallels/2014/06/25/325240653/how-much-does-a-terrorist-attack-cost-a-lot-less-than-you-think.  Furthermore, in contrast to the sophisticated attacks of September 11th, which cost about $500,000 and took years of planning to execute, terrorist groups such as ISIS have been able to inflict maximum carnage and mass-casualty attacks for a fraction of

the cost.[12]  See Emilie Oftedal, The Financing Of Jihadi Terrorist Cells In Europe, The Norwegian Defense Research Establishment (Jan. 6, 2015), available at http://www.ffi.no/no/Rapporter/14-02234.pdf (noting an ISIS attack in Cologne, Germany that was estimated to have cost only $500).  This shift towards inexpensive attacks reflects a change in tactics by ISIS, which has advocated lone offender and small group attacks that can be carried out quickly, with minimal funding and preparation, and has also published how-to guides offering advice on carrying out attacks with low-tech, low-cost weapons such as IEDs, vehicles, knives, and arson.

The defendant's promotion and online distribution of ISIS bomb-making instructions and acquisition of explosive material and knives is also alarming.  Notably, the fireworks recovered from the defendant's car were not in plain view—they were concealed in a hidden area in the trunk, discovered only after a law enforcement officer pulled back the carpet of the trunk.  The explosive material in these fireworks was sufficient to create the very device—a soda can grenade—that the defendant posted about and had a how-to manual on.  In light of ISIS's call for "lone wolfs" to "rise up" and its specific instructions that, "If you can't make the hijrah, dont sit at home & give up . . . ignite a bomb, stab a kaffir, . . . . [and] know that your jihad is not over just because you got stopped [from traveling,]" the defendant's steps in this regard should be taken seriously.

The defendant's conduct represents a unique and violent brand of criminality that simultaneously shows no respect for human life or the rule of law.  Under such circumstances, a Guidelines sentence is entirely appropriate.

II.     The Need for Specific and General Deterrence Is High

A Guidelines sentence is also necessary to deter the defendant and others who contemplate providing material support to ISIS.

The "strong need to deter terrorism is evident from the Guidelines recommendation that a terrorism defendant be accorded a criminal history of VI, the highest

---

[12]     See also National Commission on Terrorist Attacks upon the United States, The 9/11 Commission Report (Washington, D.C. 2004); Robert Windrem, "Terror on a Shoestring," NBC News (Nov. 18, 2015), available at https://www.nbcnews.com/storyline/paris-terror-attacks/terror-shoestring-paris-attacks-likely-cost-10-000-or-less-n465711; Bhakti Mamtora, "Times Square Car Bomb – How Much Did It Cost" (May 7, 2010), available at https://www.cbsnews.com/news/times-square-car-bomb-how-much-did-it-cost/ (noting inexpensive nature of various components of attack); Emilie Oftedal, The Financing Of Jihadi Terrorist Cells In Europe, The Norwegian Defense Research Establishment (Jan. 6, 2015), available at http://www.ffi.no/no/Rapporter/14-02234.pdf (estimating that three-quarters of terror attacks in Europe between 1994 and 2013 cost less than $10,000, which includes all costs associated with the attack such as travel, communication, storage, acquiring of weapons and bomb-making materials).

level possible, without regard to [a defendant's] actual criminal record." Stewart, 597 F.3d at 521.  As the Second Circuit has explained, "Congress and the Sentencing Commission had a rational basis for concluding that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time." United States v. Meskini, 319 F.3d 88, 92 (2d Cir. 2003); accord Mumuni, 946 F.3d at 112-13.  The Second Circuit continued, "even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." Meskini, 319 F.3d at 92; see Mumuni, 946 F.3d at 112-13 ("We conclude by underscoring that the Guidelines, while only advisory, appropriately reflect Congress's considered judgment that terrorism is different from other crimes").  Indeed, "[c]onsidering the serious dangers posed by all forms of terrorism, the Guidelines are in no way irrational in setting the default for criminal history at a very high level." Meskini, 319 F.3d at 92.

        This is particularly true when it comes to this defendant.  The defendant's desire to engage in violent jihad in support of ISIS, and to encourage and assist others to do so, was long-running.  His conduct spanned more than one year, and it involved considerable and deliberate planning, stealth, and execution.  As with all crimes involving the degree of premeditation evinced by the defendant, a heavy sentence is necessary to deter him and others who might consider similar conduct.  See United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) ("crimes [that] are more rational, cool, and calculated than sudden crimes of passion or opportunity…are prime candidates for general deterrence" (internal quotation omitted)).  Moreover, the defendant's offense conduct reflects a desire to wage jihad for ISIS in any manner available to him, and the defendant's conduct after his arrest demonstrates that he still holds that desire to wage jihad even while in prison.  His litany of disciplinary infractions—including multiple incidents involving assaults on correctional officers, swatting, setting fires, and property damage—reflect a persistent disrespect for rules, disregard for life and limb, and desire to cause pandemonium.  The defendant does not exhibit any remorse, regret, or reform.  In short, the defendant is a dangerous and unpredictable individual who must be incapacitated to protect the public.  His claimed immaturity and impulsivity only exacerbate this concern.  In such circumstances, the need for specific deterrence and to protect the public from further crimes of the defendant is at its zenith.  See Stewart, 590 F.3d at 181 (Walker, J., concurring) ("In no area can the need for adequate deterrence be greater than in terrorism cases, with their potential for devastating loss of innocent life.").

        Equally important in this case is general deterrence. Simply put, the sentence imposed should send a message to all would-be terrorists that if they seek to provide material support to a foreign terrorist organization, they will be caught, prosecuted, and then imprisoned for a significant period.  A Guidelines sentence in this case would send an appropriate and much-needed message to all persons harboring any (incorrect) notion that serving, joining, or aiding jihadist groups in any manner is meaningful and worth the risk.

## <u>Conclusion</u>

   In this case, a Guidelines sentence will appropriately punish the defendant's egregious conduct, and provide for appropriate deterrence and incapacitation in light of the continuing danger he and other aspiring terrorists present to the community.  The government respectfully submits that such a sentence would be sufficient, but not greater than necessary, to carry out the goals of sentencing set forth in 18 U.S.C. § 3553(a).

       Respectfully submitted,

       BREON PEACE
       UNITED STATES ATTORNEY

By:    /s/
       Saritha Komatireddy
       Margaret E. Lee
       Alexander F. Mindlin
       Assistant U.S. Attorneys
       Eastern District of New York
       718-254-7000

cc:   Clerk of Court (WFK) (by ECF)
   All Counsel of Record (by ECF)
   Shayna Bryant, United States Probation Officer (by Email)