UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
UNITED STATES OF AMERICA,                   :
                                            :
      v.                                       :    **MEMORANDUM & ORDER**
                                            :    15-CR-517 (WFK)
ALI SALEH,                                  :
                                            :
                    Defendant.        :
------------------------------------------------------------X

**WILLIAM F. KUNTZ, II, United States District Judge:**

On July 24, 2018 Ali Saleh ("Defendant") pled guilty, pursuant to a plea agreement, to two counts of attempting to provide material support to a foreign terrorist organization in violation of 18 U.S.C. § 2339B(a)(1). The Court now sentences him and provides a complete statement of reasons pursuant to 18 U.S.C. § 3553(c)(2) of those factors set forth by Congress and contained in 18 U.S.C. § 3553(a). For the reasons discussed below, Defendant is hereby sentenced to 360 months of incarceration followed by a lifetime term of supervised release; no fine; and a $ 200.00 mandatory special assessment.

## BACKGROUND

On July 24, 2018 Ali Saleh ("Defendant") pled guilty, pursuant to a plea agreement, to two counts of attempting to provide material support to a foreign terrorist organization in violation of 18 U.S.C. § 2339B(a)(1). The Court hereby sentences Defendant and sets forth its reasons for Defendant's sentence using the rubric of the 18 U.S.C. § 3553(a) factors pursuant to 18 U.S.C. § 3553(c)(2).

## DISCUSSION

**I.   Legal Standard**

18 U.S.C. § 3553 outlines the procedures for imposing sentence in a criminal case. The "starting point and the initial benchmark" in evaluating a criminal sentence is the Guidelines sentencing range. *Gall v. United States*, 552 U.S. 38, 49 (2007). If and when a district court chooses to impose a sentence outside of the Sentencing Guidelines range, the court "shall state in open court the reasons for its imposition of the particular sentence, and . . . the specific reason for

the imposition of a sentence different from that described" in the Guidelines. 18 U.S.C. § 3553(c)(2). The court must also "state[] with specificity" its reasons for so departing or varying "in a statement of reasons form." *Id.*

"The sentencing court's written statement of reasons shall be a simple, fact-specific statement explaining why the guidelines range did not account for a specific factor or factors under § 3553(a)." *United States v. Davis*, 08-CR-0332, 2010 WL 1221709, at *1 (E.D.N.Y. Mar. 29, 2010) (Weinstein, J.). Section 3553(a) provides a set of seven factors for the Court to consider in determining what sentence to impose on a criminal defendant. The Court addresses each in turn.

II.   **Analysis**

    A.    **The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant**

The first § 3553(a) factor requires the Court to evaluate "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

    i.    <u>History and Characteristics of the Defendant</u>

Defendant was born on December 18, 1992, in Queens, New York. Presentence Investigation Report ("PSR") ¶ 69, ECF No. 133. He is one of four children born to the marriage of Saleh Musa and Fatimah Musa. *Id.* Defendant's father owns a grocery store and works as security guard for a company that delivers money to automatic teller machines. *Id.* His mother is a homemaker. *Id.* Defendant has good relationships with his parents and they remain supportive of him despite his incarceration for the instant offense. *Id.* In telephonic interviews, Defendant's parents described him as "a good kid" and expressed a profound sense of sadness

over Defendant's legal situation. *Id.* ¶ 70. Defendant's siblings are also aware of the instant offense and remain supportive. *Id.* ¶ 71.

Defendant described growing up in a home with basic necessities, free from any instances of abuse or neglect. *Id.* He graduated from Hilcrest High School in Queens in 2010 and attended the City College of New York between January 2011 and May 2011, when he was 21 years old. *Id.* ¶ 92, 93. Defendant attended LaGuardia Community College in Queens, New York, from March 2013 until June 2014. *Id.*

Prior to his incarceration, Defendant was employed as a deli clerk at his father's grocery store and as a cashier at his uncle's restaurant and was otherwise supported by his parents. *Id.* ¶¶ 94–98. Between December 2014 and July 2015, Defendant lived with his uncle, in Fort Wayne, Indiana. *Id.* ¶ 73. Prior to his arrest in this case, Defendant lived with his parents in Queens. *Id.* ¶ 74. Defendant is single, has never married, and has no children. *Id.* ¶ 72.

Defendant is generally in good physical health, other than minor health problems, including a vitamin deficiency and low blood pressure. *Id.* ¶ 81. During his incarceration for the instant offense, he has been treated in connection with a hunger strike and also taken to the hospital for a "drug overdose" that was deemed "accidental or unintentional." *Id.* ¶¶ 82–83.

Defendant has undergone comprehensive psychological evaluation since his arrest. *Id.* ¶ 84. The results of these evaluations have been inconclusive in determining Defendant's specific mental health issues. Defense counsel argues that Defendant's offenses result from "substantial impairments in Mr. Saleh's decision-making ability brought about by significant mental health impairments." *See* Def. Sentencing Memorandum ("Def. Mem.") at 8, ECF No. 157. *Id.* ¶¶ 84–90. Defendant declined psychological services while in prison. PSR ¶ 84.

    ii.   <u>Nature and Circumstances of the Offense</u>

3

In approximately 2013, Defendant became interested in the conflict in Syria, specifically in ISIS. Gov. Sentencing Memorandum ("Gov. Mem.") at 3, ECF No. 144. ISIS is widely recognized as one of the preeminent terrorist threats in the world today, responsible for more deaths than any other terrorist or extremist group over the past several years. *Id.* at 2. At the time of Defendant's offense conduct, ISIS was pursuing the objective of establishing an Islamic state, or caliphate, based in the Middle East. *Id.* ISIS routinely carried out killings and deliberate targeting of civilians; mass executions; persecution of individuals of communities on the basis of their religion, nationality, or ethnicity; kidnapping of civilians; forced displacement of Shia Muslim communities and minorities; killing and maiming of children; rape; and other forms of sexual violence. *Id.* Defendant swore an oath of allegiance to ISIS and decided to travel to the Middle East in support of ISIS. *Id.* at 3.

          a.     *Defendant's Social Media Postings*

Defendant espoused his support for ISIS through multiple public online forums. *Id.* at 4. He had at least nine Twitter accounts, as well as accounts on Facebook, Kik, and Telegram, and over the course of more than one year, he posted and reposted hundreds of messages glorifying ISIS, promoting violent jihad, spreading ISIS's propaganda, and supporting its objectives. *Id.* During this same time period, one of the photographs associated with Defendant's Twitter account was a photograph known to be an ISIS recruitment billboard in Iraq. *Id.* at 7.

Defendant also made efforts to facilitate others' support of ISIS. *Id.* at 9. Through his social media accounts, he held himself out to be someone who would assist others who wanted to make "hijra" (travel) and join ISIS in the Middle East. *Id.* Defendant chose Twitter usernames that included "hijra_sponsor" and "sponsoramujahid"—which translate to "travel sponsor" and "sponsor a fighter." *Id.* When other ISIS supporters contacted Defendant on Twitter for his

4

assistance with traveling to ISIS-controlled territory, he provided them with contact information for ISIS facilitators who could help or redirected them to contact him using encrypted messaging services. *Id.*

      b. *Defendant's Attempts to Travel to the Middle East and His Support of Other ISIS Fighters*

Defendant was arrested after repeatedly attempting to travel to the Middle East to become a foreign fighter for ISIS. *Id.* at 8. Defendant first attempted to travel to join ISIS on August 28, 2014 when he made an airline reservation from New York to Turkey, a country bordering Syria. *Id.*

After this failed attempt to travel, Defendant ordered a fire starter knife and folding knife from Amazon, as well as a book titled "Messages to the World: The Statements of Osama Bin Laden." On Twitter, he retweeted, "Do not ask for anyone's advice and do not seek anyone's verdict. Kill the disbeliever whether he is civilian or military," and tweeted, "Get close to the real kuffar and assassinate them." *Id.* at 5.

In October 2014, Defendant communicated with an ISIS supporter in Mali through an online messaging platform and sent a wire transfer in the amount of $500.00 to fund that person's travel to Syria. *Id.* at 10. During the same time period, Defendant communicated with other individuals to facilitate their support of ISIS, including known ISIS supporters in the United Kingdom and Australia. PSR ¶ 7.

In July 2015, Defendant purchased fireworks containing 1,196 grams of low explosive powder, hid them in a concealed compartment in the trunk of his car, and drove from Indiana towards New York City. *Id.* ¶¶ 9–10. On Defendant's phone, law enforcement agents discovered instructions regarding how to create a bomb using explosive powder from fireworks.

5

*Id.* The fireworks Defendant possessed were sufficient to create multiple soda can grenades like the one depicted in the instructions and in an online post by Defendant. Gov. Mem. at 8. They were also sufficient to create the pressure cooker bomb described in the instructions. *Id.* As Defendant drove toward New York City with the explosive materials in his trunk, his car broke down, and he was forced to have it towed. *Id.* In addition to the fireworks, law enforcement officers found a tactical knife located inside the car. *Id.*

In 2015, Defendant rededicated his efforts to joining ISIS overseas. Defendant made at least five separate attempts, over ten days, to travel to the Middle East to fight for ISIS. Gov. Mem. at 8. First, on July 24, 2015, he contacted an ISIS facilitator in Libya, who had instructed followers to contact him on the encrypted platforms Kik and Telegram "for hijrah [travel] advice to IS in Libya ONLY." *Id*. at 9. Defendant then made a same-day one-way booking to travel on Qatar Airways from New York's JFK airport to Doha, Qatar then to Cairo, Egypt. Notably, Egypt and Libya are bordering countries and it was relatively common at that time for individuals to travel from Egypt to Libya to join ISIS. When Defendant attempted to pay for the flight at the JFK airline ticket counter, he was declined. Later that evening, Defendant attempted to buy tickets to Egypt at Newark Liberty International Airport in Newark, New Jersey, but was declined again. *Id*.

On July 26, 2015, Defendant reserved a flight itinerary for a same day one-way departure on Qatar Airways from Philadelphia International Airport to Cairo, Egypt. *Id*. When Defendant attempted to obtain a boarding pass, he was denied. The next day, Defendant went to Indianapolis International Airport in Indiana, and appeared to again inquire into flights. He left the airport without making any reservations. *Id*.

6

Finally, on August 2, 2015, Defendant went to an Amtrak train station in Cleveland, Ohio, and attempted to take a train to Toronto, Canada, where he intended to fly from Toronto to Yemen. After law enforcement intervention, he did not board the train to Toronto and instead returned to New York City. *Id.*

On September 17, 2015, law enforcement agents arrested Defendant at his home. During a search of the home, agents recovered paper copies of an itinerary and a Turkish visa issued in Defendant's name for his September 2014 attempt to travel, and a duffel bag containing flashlights, headlamps, and other survival gear. *Id.* at 16. Agents also recovered a black trunk containing 29 machetes near Defendant's sleeping area. Defendant acknowledged his Miranda rights but was generally uncooperative in his post-arrest interview. *Id.*

    *c. Defendant's Subsequent Conduct*

Defendant has been in pretrial detention at the Metropolitan Detention Center ("MDC") since September 2015. As detailed in the Presentence Report, Defendant has been cited on at least 100 separate occasions for committing disciplinary infractions, many of which involved acts of violence. PSR ¶ 75.

In October 2015, Defendant was cited for: giving/ accepting money without authorization because his personal identification number was used by another inmate to place calls; removing his handcuff from his left hand and slipping out of his waist chain and then attempting to conceal the restraints by covering his arms with a blanket; and refusing to consent to a visual search. *Id.*

In November 2015, Defendant was cited for: refusing to consent to a visual search and refusing to appear at his disciplinary hearing; being unsanitary and untidy and refusing to obey an order for refusing to comment during his disciplinary hearing; being disruptive and barricading his cell window with his mattress in order to obstruct the view of his cell from staff;

disobeying staff when they asked him to remove the obstructions; and hitting the duress alarm button and jamming the alarm button in the Special Housing Unit. *Id*.

In December 2015, Defendant was cited for multiple instances of refusing to attend his disciplinary hearing and refusing to be searched in SHU. *Id*.

In June 2016, Defendant was cited for failing to stand for a prison count and refusing to obey an order to do so; refusing to obey an order because he was found in a common area with a sweatshirt and a sheet wrapped around him; being in an unauthorized area during a lock down drill; refusing to remove sheets of paper from his cell window; blocking his cell window and cell slot with paper in order to obstruct the view from staff, refusing to remove the paper when ordered to do so, and not complying when asked to submit to restraints; and activating the SHU duress alarm multiple times when there was not an emergency. On one occasion, BOP staff found Defendant's food slot open. As the BOP officer began to secure food slot, Defendant charged the food slot from the back of his cell which resulted in the bar smashing into the officer's knee multiple times. When Defendant was ordered to stop movement, he refused to do so. Several minutes later, as BOP staff were attempting to photograph the cell, Defendant kicked the BOP officer in his midsection, which resulted in redness and swelling to his torso. *Id*.

In July and August of 2016, Defendant was cited for: refusing to attend his disciplinary hearing multiple times; covering his cell window in SHU, refusing to remove the covering, and jamming the food slot with a plastic bag; covering his cell window in SHU again; activating the duress alarm repeatedly; and kicking a BOP officer in the upper torso during a pat-down search. *Id*.

In September 2016, Defendant was cited for: covering his cell window in SHU; refusing to attend his disciplinary hearing multiple times; breaking his food slot box multiples times;

8

refusing to stop pulling on a light fixture while standing on the top bunk and attempting to kick BOP officers when they removed him and placed him against the wall; and destroying property valued at $100 or less for ripping the plastic covering of his mattress in SHU. *Id*.

In October 2016, Defendant was cited for: fighting with another inmate; refusing to remove a covering from his cell window; refusing to attend a disciplinary hearing; and destroying the light fixture in his room and removing a metal desk from the wall in SHU. Additionally, Defendant was cited for banging on his cell window with a metal stool seat that he had broken off from his cell table, and damaging the food port lock on his cell door and shattering the glass window. Defendant, still holding the stool seat, told officers "I'm going to hit whoever comes in here with this." He continued to be combative and threatened to kick mdc officials as they subdued him. *Id*.

In December 2016 and January 2017, Defendant was cited for refusing to remove paper covering his cell window in SHU multiple times; refusing to attend his disciplinary hearing multiple times; possessing a dangerous weapon, i.e., a broken piece of his plastic food tray in his hand; placing his arm inside the food slot in SHU; and fighting with another person. *Id*.

In April 2017, Defendant was cited for attempting to grab the duty belt of the officer through a food slot in his special housing unit cell; refusing to be placed in restraints multiple times; and kicking an officer in the thigh and hitting him in the back of his head during a routine pat-down search. *Id*.

In June and August 2017, Defendant was cited for assaulting someone without serious injury multiple times; destroying property valued over $100 multiple times; refusing to obey an order; possessing a dangerous weapon; and fighting with another person. *Id*.

9

In September and October 2017, Defendant was cited for refusing to obey an order; assault multiple times, with and without a serious injury; interfering with taking count, setting a fire and possessing a dangerous weapon. *Id*.

In November 2017, Defendant was cited for destroying property over $100; and refusing to appear for his disciplinary hearing. Additionally, Defendant was cited for possession of a dangerous weapon, destroying government property, and tampering with security devices. Defendant covered his cell window in the special housing unit. BOP staff observed him banging and kicking on the door repeatedly. When he uncovered the window, he was in possession of a large metal object from the light fixture which he used to bang on the door. Defendant was thereafter placed in restraints and removed from his cell. Upon inspecting his cell, BOP staff observed that the security screws from the light fixture and light bulb were removed, and the desk attached to the wall was damaged. *Id*.

In December 2017 and January 2018, Defendant was cited for interfering with taking count; refusing to appear at his disciplinary hearing; destroying property; and assaulting someone without serious injury. *Id*.

In March 2018, Defendant was cited for assault without serious injury multiple times. On one occasion, Defendant threw an unknown substance through an open food slot in his special housing unit cell. He thereafter refused to close the food slot and stated: "I want my sheet . . . I want my sheet." On another occasion staff observed Defendant attempting to destroy the ceiling tiles and light fixtures in his cell. When staff attempted to move Defendant to another cell, he became combative and struck an officer in the head and torso with a closed fist. He then refused to appear at his disciplinary hearing. Defendant was also cited for refusing a drug/ alcohol test. *Id*.

On April 24, 2018, Defendant was cited for possessing a dangerous weapon and assault without serious injury. According to the BOP discipline hearing officer report, an inmate was observed with superficial lacerations on left forearm that were consistent with being cut with a sharp object. While investigating this incident, BOP staff discovered that Defendant had recently went through a metal detector, which revealed a 2-inch piece of aluminum metal located on his person, and it was determined that he used the metal object to assault the other inmate. Defendant then refused to appear at his disciplinary hearing. *Id*.

On July 13, 2018, Defendant was cited for possessing a dangerous weapon and assaulting a BOP officer with a knife. This is the incident for which Defendant was indicted in Docket Number 18-CR-468. *Id*.

In August, October and November 2018, Defendant was cited for refusing to obey orders; destroying property valued at $100 or less multiple times; and possessing a dangerous weapon.

In March and April 2019, Defendant was cited for interfering with security devices; destroying property valued over $100; and possessing a dangerous weapon. *Id*.

In May 2019, Defendant was cited for: destroying property valued at $100 or less when he bent his handcuff and took it off. *Id*.

In February, March, and May 2020, Defendant was cited for possessing a dangerous weapon. *Id*.

In September, October, November, and December 2020, Defendant was cited for destroying property valued at a $100 or less; destroying property valued over $100 multiple times; possessing a dangerous weapon; assaulting without serious injury; setting a fire; refusing to obey an order and interfering with taking count. *Id*.

In January through May 2021, Defendant was cited for assaulting someone without serious injury, multiple times; refusing to obey an order, multiple times; possessing a dangerous weapon; interfering with security devices, multiple times, refusing to obey an order, and destroying property over $100.  PSR Add.

### B.    The Need for the Sentence Imposed

The second § 3553(a) factor instructs the Court to consider "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  18 U.S.C. § 3553(a)(2).

The Court's sentence recognizes the seriousness of Defendant's offense and punishes Defendant accordingly.  It seeks to deter Defendant from further criminal activity, from disregarding U.S. law, and from engaging in illicit activity.

### C.    The Kinds of Sentences Available

The third § 3553(a) factor requires the Court to detail "the kinds of sentences available" for Defendant.  18 U.S.C. § 3553(a)(3).

Defendant pled guilty, pursuant to a plea agreement to Counts Two and Three of the Superseding Indictment, both charging Defendant with Attempt to Provide Material Support to a Foreign Terrorist Organization, in violation of 18 U.S.C. § 2339B(a)(1).  For Count Two, Defendant faces a statutory maximum imprisonment term of fifteen (15) years pursuant to 18 U.S.C. § 2339B(a)(1)(2014).   For Count Three, Defendant faces a statutory maximum imprisonment term of twenty (20) years pursuant to 18 U.S.C. § 2339B(a)(1)(2015).  On both

12

Counts Two and Three, Defendant faces a statutory maximum supervised release term of life pursuant to 18 U.S.C. § 3583(j), per count to be served concurrently; a fine of up to two-hundred and fifty thousand dollars ($250,000.00) pursuant to 18 U.S.C. § 3571(b), per count; and a mandatory special assessment of one hundred dollars ($100.00) pursuant to 18 U.S.C. § 3013, per count.

### D. The Kinds of Sentence and the Sentencing Range Established for Defendant's Offenses

The fourth § 3553(a) factor requires the Court to discuss "the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines[.]" *Id*. § 3553(a)(4)(a).

The parties disagree as to whether Defendant's total offense level in this case, Docket Number 15-CR-517, should be grouped with the total offense level in Docket Number 18-CR-468. While the instant case concerns Defendant's attempts to join and support ISIS, Docket Number 18-CR-468 concerns Defendant's assault of a prison guard using a contraband knife. Accordingly, the Court will, as proposed by the Government, treat each case as a separate proceeding and sentence the Defendant separately in each case. Despite Probation's grouping of the total offense levels in the Presentence Investigation report, and defense counsel's desire to consolidate the proceedings, the Government notes they have not and do not consent to a consolidated proceeding.

The purpose of the grouping rules set forth in Part 3D of the Sentencing Guidelines is to prevent multiple punishments for substantially identical conduct. This is not the case here. Accordingly, this Court proceeds to sentence Defendant separately under each indictment.

The applicable guideline for a violation of 18 U.S.C. § 2339(b)(a)(1) is USSG § 2M5.3(a), which all parties agree provides a base offense level of twenty-six (26). The parties also agree that because Defendant transported one thousand one hundred and ninety-six (1,196) grams of explosive powder in a concealed compartment inside the trunk of his car during the instant offense, two (2) levels are added, per USSG § 2M5.3(b)(1)(c). The parties also agree that because the offense is a felony that involved or was intended to promote a federal crime of terrorism, the offense level is increased by twelve (12) levels.

Furthermore, the Government and Defense counsel agree that Defendant's acceptance of responsibility pursuant to USSG §§ 3E1.1(a)-(b) results in a three (3) level reduction. However, because Probation groups the offenses in this case and in Docket Number 18-CR-468, they do not credit Defendant with this reduction because after his arrest, he has continued to commit crimes and infractions in prison. Therefore, Defendant's total offense level according to the Government and Defense counsel is thirty-seven (37). Defendant's total offense level according to Probation is forty (40).

The parties agree Defendant has a Criminal History Category of six (VI). Because Defendant has no known prior criminal convictions, his criminal history score is zero (0) which generally establishes a Criminal History Category of One (I). However, because the instant offense is a felony that involved, or was intended to promote, a federal crime of terrorism, Defendant's criminal history category is automatically a Category six (VI), pursuant to USSG §3A1.4(b).

A total offense level of thirty-seven (37), or forty (40), with a Criminal History Category of six (VI), yields a Guidelines imprisonment range of three hundred and sixty months (360) to life. However, because of the statutory maximum sentence, the effective guidelines range is

three hundred and sixty months (360) to four hundred and twenty (420) months of imprisonment. Additionally, the Guidelines further suggest a term of supervised release of one (1) year to life; a fine of between fifty thousand ($50,000.00) dollars and five hundred thousand ($500,000.00) dollars; and that Defendant is ineligible for probation.

The United States Probation Department recommends a sentence of fifteen (15) years of custody on Count Two (2) and twenty (20) years of custody on Count three (3), to run consecutively; fifteen (15) years of supervised release to run concurrently on each count; and the special conditions outlined in their sentencing recommendation.

The Government recommends a Guidelines sentence of between three-hundred and sixty (360) and four hundred and twenty (420) months, and notes that the Defendant consented to a life term of supervised release in his plea agreement.

Defense counsel does not ask the Court for a specific sentence on this Indictment, but instead asks for a sentence of no more than three hundred (300) months on both this Indictment and the Indictment brought against Defendant in Docket Number 18-CR-468.

### E. Pertinent Policy Statement(s) of the Sentencing Commission

The fifth § 3553(a) factor requires the Court to evaluate "any pertinent policy statement . . . issued by the Sentencing Commission." 18 U.S.C. § 3553(a)(5). In USSG §5K2.0, the Sentencing Commission outlines grounds for departure from a Guidelines sentence in some circumstances. Defense counsel argues that a downward departure from the Guidelines is warranted in this case for three primary reasons: "(1) Mr. Saleh has significant mental health issues, which would be better served by psychiatric treatment than prolonged incarceration or isolation; (2) while Mr. Saleh's custodial conduct has been far from stellar, such is the likely result of detaining a defendant with significant mental health issues in the MDC Special Housing

15

Unit ("SHU"), often in isolation, for what has now been years on end, in a facility and unit that even for the most balanced inmate has been described by judges as "inhumane"; and (3) while the intent of Mr. Saleh's crimes were odorous, his ability to succeed at completing them was as disorganized, confused, and disconcerted as his mental processes." *See* Def. Mem. at 1.

Defendant further argues that 300 months, or 25 years, is a "lengthy and substantial sentence" and that "individuals charged with gang and organized crime related murders – be it MS-13, the Bloods, Crips, or even the Mafia – often receive sentences in this District in the 20 to 25-year range, even in cases where multiple murders are alleged." *Id*. at 7.  He argues that Defendant's "institutional conduct" reflects "Dr. Xenakis's conclusion that Mr. Saleh possesses a 'Schizotypal Personality Disorder' 'manifested by bizarre and odd thinking, unusual and idiosyncratic interpretation of events and situations, and episodic overwhelming distress and dysphoria . . .'" *Id*. at 8.  Defense counsel claims this condition was exasperated by Defendant's placement in solitary confinement. *Id*. at 11.

Additionally, Defense counsel argues Defendant has been exposed to "absolutely abhorrent conditions of confinement" the past six years such as "multiple blackouts, flooding and mold in his cell, lack of heat" and most recently, disruption of food services and deprivation of "basic sanitary conditions such as cleaning supplies for their cells—this despite COVID-19 raging alarmingly through the jails . . . ." *Id*. at 13.

Defense counsel does "not dispute the disciplinary struggles that Mr. Saleh has had while detained at the MDC, but the treatment he has received cannot be justified by anything he is alleged to have done." *Id*. at 14.  Specifically, Defense counsel calls attention to a recent incident in which Defendant, upset at his prayer book being dropped, kicked the officer who was standing behind him—an officer with whom Defendant had a history of negative verbal

16

interactions. *Id.* Defense counsel states that "[t]he officer responded by throwing Mr. Saleh against the metal door to his cell so hard that he to be transported to an outside hospital. *Id.* Mr. Saleh's injuries included two puncture woods in the skull measuring approximately ½ cm – 1 cm, and substantial swelling of his face that impacted his ability to eat and speak." *Id.* In light of these circumstances, Defense Counsel argues a sentence of no more than 300 months imprisonment in this proceeding and the proceeding in Docket Number 18-CR-468 is sufficient, and not greater than necessary to achieve the goals outlined in 18 U.S.C. § 3553(a). *Id* at 16.

In contrast, Probation provides that an upward departure may be necessary in light of Defendant's multiple violent assault against MDC officers while in custody, which he was not charged with in Docket Number 18-CR-469. PSR ¶ 116. Probation states that this constitutes additional criminal activity for which Defendant is not held accountable in the advisory guidelines calculation, and may warrant an upward departure, pursuant to USSG § 5K2.21. Additionally, Probation notes that "because of the grouping rules, the additional conviction on the assault charges resulted in no change from the original advisory guideline range. *Id.* As a result, this range may not provide appropriate additional punishment for the assault conduct. *Id.* The Court may consider this as a basis for departure, pursuant to the Background in the Commentary to USSG §3D1.4." PSR. ¶ 17. Because the Court is conducting separate sentencings, this factor is not relevant.

### F. The Need to Avoid Unwarranted Sentence Disparities

The sixth § 3553(a) factor requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). For the reasons stated in this Memorandum and

17

Order, and considering the other six § 3553(a) factors, the Court's sentence avoids unwarranted sentence disparities.

### G. The Need to Provide Restitution

Finally, the seventh § 3553(a) factor, which requires the Court to touch upon "the need to provide restitution to any victims of the offense," 18 U.S.C. § 3553(a)(7). This factor is not relevant in this case.

### CONCLUSION

A sentence of 360 months of incarceration followed by a lifetime term of supervised release; no fine; and a $ 200.00 mandatory special assessment is appropriate and comports with the dictates of § 3553. This sentence is consistent with, and is sufficient but no greater than necessary to accomplish, the purposes of § 3553(a)(2).

The Court expressly adopts the factual findings of the Presentence Investigation Report and the addenda thereto, barring any errors contained therein, to the extent they are not inconsistent with this opinion. The Court also adopts the Special conditions recommended by Probation.

SO ORDERED.

s/ WFK
_____
HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: November 17, 2021
       Brooklyn, New York